MICHAEL FITZGERALD

v.

FREDERICK HONKOMP AND LAWRENCE HONKOMP.

*Master and Servant—Negligence of Vice Principal—Personal Injury to Servant—Assumption of Risk—Fellow-Servants—Request to Hurry.*

1. An employe assumes all the ordinary risks of the service which he undertakes; and this includes the risk of occasional negligence or unskillfulness on the part of his fellow-servants engaged in the same line of duty or incidental thereto, provided the employer has not been guilty of negligence in employing or retaining such fellow-servants.

2. A master is liable for an accident which happens in consequence of an improper and inconsiderate order, such as no one exercising ordinary care would have given, when such order is given by a foreman or superintendent having authority not only to give orders as to work,

but to discharge the person to whom it is given; but if an accident happens from some negligence of the foreman, which negligence related to the foreman's duties as a co-laborer with the person injured, and which might just as readily have happened with one having no such authority, the master is not liable.

[Opinion filed May 7, 1892.]

APPEAL from the Superior Court of Cook County; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Appellant was injured while working for appellees. Appellant seems to have been a general utility man in appellees' shop; he did, he says, everything about the shop. He had worked at the smelting business for five or six years. Appellees' business was that of extracting copper from refuse ore, out of which the silver and lead had previously been taken. The refuse ore was put into a furnace, and from the ore, the witnesses say, " the copper was sweated out."

The copper was run out of the furnace into square molds; these were at once taken on iron tongs and placed on a bench close up to a tank of water. The bench would hold five of the molds and had on it an iron rail. Each mold had four compartments into which the copper was run. A man at the bench took the molds while the copper was hot, and dumped the copper bricks into the water; this was necessary in order that the copper might not, by cooling in the air, lose its brightness.

Sometimes the bricks stuck to the mold and they were then dislodged by rapping the mold against the iron rail.

When the bricks had slag adhering to them, if they were not thrown into the water carefully, if they were too hot, the slag would explode away from the copper.

Upon the morning of the injury, appellant was told by the foreman to go and tend the tank and keep the copper under water. Charles Peterson was told by the foreman to go and dump the copper into the water, to dump the copper as fast as he could, while he, the foreman, was out. When the ore is melted in the furnace the copper sinks to

the bottom and the slag mostly rises to the top, and is blown or skimmed off; the evidence was that on the morning of the accident, one Johnson skimmed off all he could, but the furnace was running low, and when the copper was run off the bricks had on them some slag.

About fifteen minutes before the accident Peterson dumped a mold, and when some of the bricks went into the water there was a slight explosion, which threw water about, some of it striking appellant's face. At the time of the accident Peterson dumped a mold, and one of the bricks stopped on the flange of the iron rail and broke in two; this brick had slag on it; and appellant, who was engaged, as directed, in keeping the copper under water, pulled this brick into the tank; as it struck the water, it exploded, and some of the pieces entered appellant's eye. There was evidence that there is a great difference in the appearance of copper metal and slag.

Appellant offered to show that the subjecting of copper with slag attached in a heated condition to cold water will produce an explosion; and that the subjecting of pure copper, when heated, to cold water, will not produce an explosion. This the court refused to allow to be shown. The foreman, Tapp, had authority to hire and discharge men. The jury were, on motion of appellees, instructed to return a verdict for appellees and judgment was entered for the defendants.

Messrs. Hynes & Dunne, for appellant.

A servant assumes such risks only as are ordinarily incident to the business. He contracts with reference to known, usual and ordinary dangers, not those which are latent, unusual or extraordinary. Thompson on Neg., 979, note; Shanny v. Androscoggin Mills, 66 Me. 427.

The real question is, not what risks appellant assumed, but were appellees, acting through their foreman, Tapp, guilty of personal negligence in failing to extract the slag before ordering the melted mass thrown into the water; or, if they could not extract the slag, was it not negligence in them to

order it thrown into the water at all? Tapp was not appellant's fellow-servant in the same line of employment, but representative of appellees. Whart. on Neg., Sec. 207; C. & A. R. R. Co. v. May, 108 Ill. 299; W., St. L. & P. Ry. Co. v. Hawk, 121 Ill. 259; Consolidated Coal Co. v. Wombacker, 134 Ill. 57; Fanter v. Clark, 15 Ill. App. 470; Thompson v. C., M. & St. P. Ry. Co., 14 Fed. Rep. 564.

The matters concerning which the witness Ryan was interrogated were proper for an expert to explain, and it was error to reject such testimony. Penn. R. R. Co. v. Conlan, 101 Ill. 93; C., B. & Q. R. R. Co. v. Gregory, 58 Ill. 279; Weber Wagon Co. v. Kehl, 29 N. E. Rep. 714.

The court erred in taking the case from the jury.

The court erred in overruling appellant's motion for a new trial.

Mr. W. J. DURHAM, for appellees.

The general doctrine is well summed up in one of the books, as follows:

"Where an employe, after having the opportunity of becoming acquainted with the risks of his situation, accepts them, he can not complain if subsequently injured by such exposure. By contracting for the performance of hazardous duties, he assumes such risks as are incident to their discharge. In performing the duties of his place, a servant is bound to take notice of the ordinary operation of familiar natural laws, and to govern himself accordingly. If he fails to do so, the risk is his own. He is bound to use his eyes to see that which is open and apparent to any person using his eyes, and if he fails to do so he can not charge the consequences upon the master." 14 Am. & Eng. Enc. of Law, 842, and cases there cited; I. C. R. R. v. Cox, 21 Ill. 201, and a line of subsequent decisions.

1.  That the action is barred by the statute of limitations, see following additional authorities.

Names of parties can not be amended so as to vary the cause of action. Peck v. Still, 3 Conn. 157; Atkinson v. Clapp, 1 Wend. (N. Y.) 71.

Fitzgerald v. Honkomp.

In Leeds v. Lockwood, 96 Pa. St. 464, a plaintiff in ejectment had described the wrong property, and was allowed to amend, but not so as to avoid the bar of the statute.

It has been held that a new count in ejectment setting up a demise from a different party can not be added by amendment so as to relate back. Sicard v. Davis, 6 Pet. 124; Wilkes v. Elliott, 5 Cr. Ct. 611.

In Miller v. McIntyre, 5 Cr. C. Ct. 61, it was held that an amendment to a bill in equity bringing in new parties did not relate back.

2. There is no foundation in law for the main charge in the declaration, that it was in any respect the duty of the defendants, in so causing the said heated bars or slabs of copper to be dumped, to see that the same were sound, clean and free from slag and other foreign and deleterious substances before such heated bars or slabs of copper were dumped into said water vat and the water herein contained.

From the very nature of the business this is shown to be an impossibility.

3. Under the circumstances of this case, Tapp, the so-called " foreman," was not a " superior " or " vice-principal," standing in such relation between the plaintiff and defendants, as to charge the defendants with any liability in this case.

4. And if he were, such orders, if any, as he did give, were not of a kind to come within the rules and authorities applicable to the case.

5. There is no ground for a charge of negligence against the defendants, from the fact, if fact it is, that what the witnesses call " slag," or " dross," was formed on any of the pigs of copper.

6. But if there is any such ground, and if there was any such negligence, it was negligence of the man who runs the stuff from the furnace—a fellow-servant of the plaintiff, in the same line of employment, and defendants therefore are not liable.

7. There is no proof that plaintiff was ordered or

directed by anybody, much less by any one having authority representing the defendants, to pull from the rail the particular bar or pig in question causing the injury in question; and

8.   Consequently, in doing so, the plaintiff stepped out of the line of his employment, committed an unauthorized act, for the consequences of which he is alone responsible, and the defendants therefore are not liable.   (See argument and authorities.)

9.   There was no error in striking out offered testimony as claimed by appellant's counsel.

WATERMAN, P. J.   The contention of appellant is that the accident was not the result of one of the ordinary incidents of the business; that the foreman was guilty of personal negligence in failing to extract the slag before ordering the heated mass thrown into the water, or in ordering it thrown in at all, with slag adhering as a portion thereof; that the testimony offered by appellant and rejected by the court, should have been admitted.

An employe assumes all the ordinary risks of the service which he undertakes, and this includes the risk of occasional negligence or unskillfulness on the part of his fellow-servants engaged in the same line of duty or incidental thereto, provided the employer has not been guilty of negligence in employing or retaining such fellow-servants.   I. C. R. R. Co. v. Cox, 21 Ill. 20; Wharton on Negligence, Sec. 224.

Nothing of an unusual nature was being done in the shop of appellees when the accident to appellant occurred.   Appellant was working as he was accustomed to work, and the regular business of the shop was being pursued.   There is no evidence tending to show that the adhering of slag to the copper bricks and the dumping of such bricks into water was unusual; the explosion that followed, like the slight explosion that preceded, it is shown was a natural result of the contact of hot slag and water.   We think that under the rule expressed in C. & A. R. R. Co. v. May, 108 Ill. 288, a master is liable for an accident which happens in conse-

quence of " an improper and inconsiderate order," such as
" no one exercising ordinary care would have given," when
such order is given by a foreman or superintendent having
authority not only to give orders as to work but to discharge
the person to whom it is given; but if an accident happens
from some negligence of the foreman, " which negligence
related to the foreman's duties as a co-laborer with the
person injured, and which might just as readily have hap-
pened with one of them having no such authority," the
master is not liable.

If the accident happened from Tapp's negligence in fail-
ing to extract the slag before the brick was dumped into the
water, then it happened from the negligence of a fellow-serv-
ant and there can be no recovery from the master.   Did it
happen from any improper or inconsiderate order given by
the foreman ?   The only orders given by the foreman to ap-
pellant were to " go and tend the tank and keep the copper
under water."   This was merely an order to do what was
daily done in the shop, and with the doing of which it is not
claimed the appellant was unfamiliar.   The order that ap-
pellant was obeying when the accident happened, was this
order, which, in effect, was no more than to do a portion of
the every-day work of the shop.   The work was not one of
unusual hazard in the shop.   All the business of the shop
was probably more hazardous than many employments, but
the work at which appellant was set this day, was no more
so than were other things done in the place.   The foreman
ordered Peterson to hurry up and dump the copper into the
tank.   This was but an order to do what was usually
done; the copper was ordinarily dumped into the tank as
soon as it readily could be after it was placed upon the
bench, in order that it might be kept bright.   These oper-
ations were attended with danger, but the danger was usual,
and there is nothing to show that it was one of which ap-
pellant was ignorant.   He merely testifies that he " knew
nothing about getting copper from slag."   Nor was there
any latent danger hidden from an ordinary workman.

Appellant desired to show that the contact of heated

slag with water will produce an explosion, while the contact of heated copper and water will not; the court refused at one time to allow such evidence to be given, but a witness afterward testified that if slag was not thrown in carefully, if it was too hot, the slag would explode away from the copper. Evidently that was what happened in this case; the negligence, if any, was that of Peterson, in dumping the molds, or of some workman in suffering bricks with slag adhering thereto, to be taken to the bench; such acts were the acts of fellow-servants. Even if Tapp was the person by whose negligence bricks with slag upon them were hurried from the furnace to the bench, such negligence was that of a fellow-servant. Against them no action has been brought; for the negligence of fellow-servants the master is not liable.

We understand that it is insisted by appellant that he was doing what he had been ordered; that Peterson was doing what he had just been ordered; and that in consequence of the order to Peterson, he, Peterson, did hurry up and dump the molds; that such order and its obeyal by Peterson exposed him, appellant, to an unusual danger, and that he, appellant, was also in a position where, if he did not obey the order given to him, he was liable to be discharged, and if he did obey he was exposed to unusual peril.

We do not think that there was anything unusual done; there is no evidence tending to show that the molds were dumped any more quickly than usual, or indeed than was necessary for the production of the best grade of copper; or that it was unusual for the bricks to have slag adhering thereto. Nor was there any evidence tending to show that Peterson dumped the molds any sooner than he would have done had not the foreman told him to hurry up.

So far as appears, nothing but the usual work of the shop was going on and each man doing what was ordinary every-day work.

The judgment of the Superior Court is therefore affirmed.

*Judgment affirmed.*